IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEBRASKA

| | | |
|---|---|---|
| THE BUCKLE, INC., a Nebraska corporation. | ) ) ) | Case No. 8:16-cv-432 |
| Plaintiff, | ) ) | |
| v. | ) ) | **COMPLAINT** |
| MANNINGTON MILLS, INC., a New Jersey corporation; LARRY MITHELMAN, an individual; d/b/a COMMERCIAL CONSULTANTS; d/b/a CONTRACT SALES OF IOWA, | ) ) ) ) ) ) | |
| Defendants. | | |

Plaintiff The Buckle, Inc. ("Buckle" and/or "Plaintiff"), hereby files its Complaint and alleges as follows:

### INTRODUCTION

1.      This is a breach of warranty and negligent misrepresentation action seeking monetary damages.  This action arises from a sale of goods by the Defendants to the Plaintiff and is governed by the laws of the State of Nebraska.  Defendants breached multiple warranties and made misrepresentations in the sale of flooring products that were defective and improper for their intended purpose.  Because of the defective and improper flooring products, Plaintiff has incurred significant damages.

### PARTIES

2.      Plaintiff Buckle is a corporation organized and existing pursuant to the laws of the State of Nebraska.  Buckle's principal place of business is 2407 West 24th Street, Kearney, Nebraska 68845.

3. Defendant Mannington Mills, Inc., ("Mannington Mills") is a corporation organized and existing pursuant to the laws of the State of New Jersey. Mannington Mills' principal place of business is 75 Mannington Mills Rd., Salem, New Jersey 08079.

4. Defendant Larry Mithelman is an individual who resides in the State of Iowa.

5. Defendant Commercial Consultants is a trade name registered with the State of Iowa by Defendant Mithelman.

6. Defendant Contract Sales of Iowa is a trade name registered with the State of Iowa by Defendant Mithelman.

7. Upon information and belief, at all relevant times Defendant Mithelman was engaged in business as a sole proprietorship doing business as both "Commercial Consultants" and "Contract Sales of Iowa." Collectively, Defendant Mithelman, Commercial Consultants, and Contract Sales of Iowa are hereinafter referred to as "Mithelman."

**JURISDICTION AND VENUE**

8. This Court has original jurisdiction over this action pursuant to 28 U.S.C. § 1332(a) because the amount in controversy, exclusive of interest and costs, exceeds the required jurisdictional amount, and there is complete diversity of citizenship between Plaintiff and Defendants.

9. Venue is appropriate in this Court pursuant to 28 U.S.C. § 1391(b)(2) because a substantial part of the events or omissions giving rise to the claims occurred in the District of Nebraska.

**FACTUAL ALLEGATIONS**

10. Buckle is a retailer of casual apparel, footwear and accessories and is headquartered in Kearney, Nebraska.

11. Buckle operates approximately 469 retail stores in 44 states.

12. Mithelman made recommendations and proposals to Buckle to select and supply flooring products and materials for Buckle's retail stores.

13. Mithelman and his employees or agents communicated with employees of Buckle to gather relevant information related to the selection of appropriate flooring products and materials for Buckle's retail stores.

14. Mithelman and his employees or agents became familiar with Buckle's store operations, store layout and display equipment in order to make recommendations and proposals related to the appropriate flooring products and materials for Buckle's retail stores.

**Agency Relationship Between Mithelman and Mannington Mills**

15. At all relevant times, Mithelman and his employees or agents communicated to Buckle they were representing the manufacturer in connection with Buckle's purchase of flooring products and materials from Mannington Mills.

16. Mannington Mills knew that Mithelman and his employees or agents communicated to Buckle that they were representing Mannington Mills in connection with Buckle's purchase of flooring products and materials from Mannington Mills.

17. Mithelman and his employees or agents used email addresses in their communications with Buckle that came from the domain name "Mannington.com."

18. Mannington Mills knew that Mithelman and his employees or agents used email addresses with the domain name "Mannington.com" in communications to Buckle.

19. Mithelman and his employees or agents supplied information to Buckle about various flooring products and materials on behalf of Mannington Mills.

20. Mannington Mills knew that Mithelman and his employees or agents supplied information to Buckle about various flooring products and materials on behalf of Mannington Mills.

21. Mithelman and his employees and agents led Buckle to believe that Mithelman and his employees and agents had authority to act on behalf of Mannington Mills.

22. Mannington Mills' actions and inactions led Buckle to believe Mithelman and his employees or agents had authority to act on behalf of Mannington Mills.

23. Mithelman, his employees or agents, and Mannington Mills led Buckle to believe that Mithelman and his employees or agents were authorized to represent and make statements on behalf of Mannington Mills for the sale of Mannington Mills' flooring products and materials including Mannington Mills' Nature's Paths LockSolid ("LockSolid") flooring system and Whisper 3N1 Underlayment ("Whisper 3N1").

24. Buckle's belief that Mithelman and his employees or agents had this authority was reasonable.

25. As a result, Mannington Mills is bound by the acts and statements made by Mithelman and his employees or agents made prior to and during the sale of Mannington Mills' flooring products and materials.

**Recommendation and Sale of LockSolid Flooring**

26. In 2011, Mannington Commercial, a business unit of Mannington Mills, began manufacturing and distributing a new flooring product named "LockSolid" which consisted of luxury vinyl tile planks with an interlocking feature.

27. Mannington Mills provided a "Limited 10 Year Commercial Warranty" for the LockSolid flooring system.

28. Mannington Commercial also manufactured and distributed a pad material to be installed underneath the LockSolid flooring named "Whisper 3N1".

29. On or around February 28, 2011, Mithelman presented Buckle's Facilities/Operations Department with information and prices for the LockSolid planks and Whisper 3N1 pad (collectively, "LockSolid Flooring System").

30. On or around February 28, 2011, Mithelman informed Buckle's Facilities/Operations Department that the LockSolid Flooring System "will be easier to install, look great and be very durable plus save you a lot of money."

31. On or around March 1, 2011, Lori Koeppe, Buckle's then Director of Facilities/Operations Department, expressed her concern about the stores' employees dragging tables and their effect on locking floating floors such as the LockSolid Flooring System.

32. On or around March 1, 2011, Mithelman responded "I'm told the locking system is very good. They have a test procedure for that issue and its [sic] passes big time."

33. In Spring of 2011, Mithelman visited Buckle's headquarters in Kearney, Nebraska to provide a demonstration of the LockSolid Flooring System product samples.

34. Based on Mithelman's affirmation and description of the LockSolid Flooring System, Buckle's Facilities/Operations Department made the decision in Kearney, Nebraska to order the LockSolid Flooring System for seventy-three (73) of its retail stores.

35. Based on Mithelman's affirmation and description of the LockSolid Flooring System, Buckle agreed to purchase the LockSolid Flooring System for seventy-three (73) of its retail stores from its headquarters in Kearney, Nebraska.

36. Buckle issued payments for the purchase of the LockSolid Flooring System from its headquarters in Kearney, Nebraska.

**Failure of the LockSolid Flooring System**

37. In 2013, Buckle discovered non-performance issues with the LockSolid Flooring System in some of its stores. The specific defects observed were: bubbling of the planks, chipping of the surface of the planks and separation of the planks at the interlocking connection (collectively, "Defects"). These Defects created potential tripping hazards in Buckle retail stores.

38. In 2013, Buckle provided notice to Defendants Mannington Mills, Mithelman, Commercial Consultants and Contract Sales of Iowa (collectively, "Defendants") of the Defects.

39. To date, Buckle has observed Defects in fifty-three (53) of the seventy-three (73) retail stores that installed the LockSolid Flooring System.

40. As a result of the Defects, and to avoid tripping hazards to its customers, Buckle has replaced or repaired the floors in the fifty-three (53) stores with observable Defects.

41. The total cost for the loss of the remaining use, replacement and repair of the fifty-three (53) stores is at least $5,000,000.

**COUNT I- BREACH OF EXPRESS WARRANTY-
PERFORMANCE**

42. Plaintiff incorporates by reference all other Paragraphs of this Complaint as if set forth fully herein.

43. Defendants sold Buckle the LockSolid Flooring System.

44. Defendants expressly warranted a Limited 10-Year Commercial Warranty and a Limited 10-Year No Gap Warranty.

45. Buckle expected the LockSolid Flooring System to last for at least ten (10) years.

46. The LockSolid Flooring System failed to perform as warranted.

47. Within a reasonable time after Buckle's discovery of the breach of warranty, Buckle gave Defendants notice of the breach.

48. The LockSolid Flooring System's failure to perform as warranted was a proximate cause of actual, consequential and special damage to Buckle.

49. The damage to Buckle includes loss of use, replacement and repair costs in an amount to be proven at trial, but totaling at least $5,000,000.

## COUNT II- BREACH OF EXPRESS WARRANTY- FITNESS FOR PARTICULAR PURPOSE

50. Plaintiff incorporates by reference all other Paragraphs of this Complaint as if set forth fully herein.

51. Defendants sold Buckle the LockSolid Flooring System.

52. When the contract for the sale of the LockSolid Flooring System was made, Buckle purchased the LockSolid Flooring System for a particular commercial purpose which included exposure to dragging tables and heavy foot traffic.

53. When the contract for the sale of the LockSolid Flooring System was made, Buckle relied on the Defendants' skill or judgment to select and furnish goods suitable for that particular commercial purpose.

54. When the contract for the sale of the LockSolid Flooring System was made, Buckle relied on Mithelman's statements that the LockSolid Flooring System was suitable for the particular commercial purpose which included exposure to dragging tables.

55. Defendants had reason to know of this reliance because Buckle specifically expressed its concerns on this issue to the Defendants prior to the sale and Defendants were familiar with Buckle's store operations, store layout and display equipment.

56. At the time the LockSolid Flooring System was delivered by the Defendants, the LockSolid Flooring System was not fit for the particular purpose in question.

57. Based on the representations of Mithelman, Buckle did expose the LockSolid Flooring System to dragging tables and heavy foot traffic.

58. Within a reasonable time after Buckle's discovery of the breach of warranty, Buckle gave Defendants notice of the breach.

59. The LockSolid Flooring System's failure to perform its particular purpose was a proximate cause of actual, consequential and special damage to Buckle.

60. The damage to Buckle includes loss of use, replacement and repair costs in an amount to be proven at trial, but totaling at least $5,000,000.

### COUNT III- BREACH OF IMPLIED WARRANTY- MERCHANTABILITY

61. Plaintiff incorporates by reference all other Paragraphs of this Complaint as if set forth fully herein.

62. Defendants sold Buckle the LockSolid Flooring System.

63. At the time of the sale, Defendants were merchants of commercial flooring material.

64. At the time of the sale, the LockSolid Flooring System was not merchantable as a commercial flooring material.

65. Within a reasonable time after Buckle's discovery of the breach of warranty, Buckle gave Defendants notice of the breach.

66. The LockSolid Flooring System's failure to perform its particular purpose was a proximate cause of actual, consequential and special damage to Buckle.

67. The damage to Buckle includes loss of use, replacement and repair costs in an amount to be proven at trial, but totaling at least $5,000,000.

### COUNT IV- NEGLIGENT MISREPRESENTATION

68. Plaintiff incorporates by reference all other Paragraphs of this Complaint as if set forth fully herein.

69. Mithelman represented to Buckle that the LockSolid Flooring System would be a suitable product for Buckle retail stores.

70. Mithelman made this representation on behalf of all Defendants.

71. Mithelman's representation to Buckle was false.

72. Mithelman was negligent or careless in making the false representation to Buckle.

73. When Mithelman made the representation, Mithelman intended that Buckle rely on the representation.

74. Buckle did rely on Mithelman's representation.

75. Buckle's reliance on the representation was reasonable.

76. Mithelman's representation was a proximate cause of actual, consequential and special damage to Buckle.

77. The damage to Buckle includes loss of use, replacement and repair costs in an amount to be proven at trial, but totaling at least $5,000,000.

### PRAYER FOR RELIEF

WHEREFORE, Plaintiff respectfully submits and prays for a judgment in its favor and against Defendants as follows:

(a) Actual, consequential and special damages, including loss of use, replacement and repair costs, in an amount to be determined at trial;

(b)     Prejudgment and post-judgment interest at the lawful rate; and

(c)     Any further relief that this Court deems just and proper, and any other relief allowed by law.

Dated this 15th day of September 2016.

                THE BUCKLE, INC., Plaintiff.

By: /s/ Gene Summerlin
     Gene Summerlin (NE # 19611)
     Brent A. Meyer (NE # 25994)
     HUSCH BLACKWELL LLP
     13330 California Street, Suite 200
     Omaha, Nebraska  68154
     Tel: (402) 964-5000
     Fax: (402) 964-5050
     gene.summerlin@huschblackwell.com
     brent.meyer@huschblackwell.com